**Katie Usalatz (Katie Pleshe), Appellant, v. Estate of John Pleshe, Deceased, Appellee.**

Opinion filed November 8, 1939. Rehearing denied and opinion modified December 13, 1939.

PAUL A. JONES and EOVALDI & EOVALDI, all of Benton, for appellant.

HICKMAN & HICKMAN, of Benton, FRANK E. TRO-BAUGH, of West Frankfort, for appellee; STEPHEN E. BRONDOS, of West Frankfort, of counsel.

MR. JUSTICE DADY delivered the opinion of the court.

The appellant, Katie Usalatz, herein referred to as the "claimant," filed in the county court of Franklin

county her claim for services in the sum of $2,100 against the estate of John Pleshe, deceased. The county court allowed her claim in the sum of $468. On appeal to the circuit court a jury returned a verdict for the defendant estate. A motion by claimant for a new trial was overruled and judgment was entered on the verdict against the claimant, to review which judgment claimant brings this appeal.

John Pleshe died testate on October 13, 1937. During the times in question he ran a small general store, and lived with two of his daughters in the rear of the store building. The ages of the daughters is not clearly shown but they were young women. In October or November, 1934, John Pleshe took the claimant, from where she was then living a few miles distant, to his home, and thereafter she lived in his home until his death. At the time of moving to his home her name was Katie Usalatz; after that she was known as Katie Pleshe. She had three children who were also grown up but did not live with her at the time decedent took her to his home or thereafter. Counsel for both parties say there is no evidence showing they were ever married to each other. The case is argued on the theory and we will assume that they were not married to each other. The record does not show the facts but the case was tried in the trial court and is presented in this court on the apparent assumption, and we will so assume, that at the time he so took her to his home the decedent was a widower or divorced, and the claimant was a widow or divorced. From the time of coming to his home in 1934 until his death she lived with him as a member of his household, occupied the same bed with him, ate at the same table with him and his two daughters, and helped the daughters in performing the household duties. To all outward appearances, during all the time the claimant lived at the home of decedent, she was his lawful wife. The two daughters, as witnesses for the defense, on cross-examination testified

they did not know until the death of their father that he and the claimant were not married, but they were not asked and did not testify as to any declaration or admission by either the decedent or the claimant. Turkalay, a witness for the claimant, testified that in September or October, 1934, at the home of the claimant and before she moved to the home of the decedent, the claimant introduced the decedent to the witness as her "boy friend" and that thereupon the decedent said "I got all fixed up to be married," and that on the next day he was going to move the claimant to his home. About 10 days later, but in the absence of the claimant, the decedent told the same witness everything was "oke-doke," and the witness then asked the decedent "where he was married and he said at Pinckneyville." James Brown, chief of police of the town where the decedent lived, a witness for the claimant, testified that after claimant moved into the home of the decedent the decedent introduced her to Brown as his wife. One Pytlak, a witness for the claimant, testified that on one occasion he came to the store to get some peppers and that the decedent told him to go in the kitchen and see his wife and have her get some from the garden, and that thereupon the witness went into the kitchen and there saw the claimant and the claimant then got the witness such peppers. Five other witnesses for the claimant testified that after the time the claimant moved into the home of the decedent the decedent told each of such witnesses that he had married the claimant, but the record does not show that any of these statements were made in the presence of the claimant. Claimant, as a witness in her own behalf, testified that when decedent's will was opened after his death was when she first found out or knew that she and the decedent had not been married. The record shows that if she is entitled to recover, her services were worth from $2.50 to $3.00 per week.

By the will of the decedent he first provided that all his just debts be fully paid and that, after the payment of his just debts . . . and after the making of other bequests out of a certain fund "Mrs. Katie Pleshe is to be paid the sum of five hundred dollars ($500.00). I give this amount of five hundred dollars ($500.00) to Mrs. Katie Pleshe on account of the fact that she has lived in our family and has administered to my comfort for many years." This was the only reference to the claimant made in the will of the decedent.

The foregoing was all of the evidence material to the issues in this case.

Claimant contends the court erred in not permitting one witness to testify that the general understanding in the community was that the claimant was the wife of decedent. Such testimony would have been a mere expression of opinion or a conclusion. The court did not err in such ruling. Other than this, no complaint is made of the admission or rejection of evidence or of the conduct of the trial proceedings.

Claimant's principal contention is that the evidence shows that she "rendered services to the deceased at his request, under the mistaken belief that she was his wife, he knowing that she was not, and voluntarily accepting such services," and that "in equity and good conscience the plaintiff is entitled to recover from his estate for the reasonable value of these services, the obligation to pay therefor resting not on contract but on broader considerations of justice and equity." Claimant cites as authority in support of such theory the case of *In re Fox's Estate,* 178 Wis. 369, 190 N. W. 90. Briefly, the holding in the *Fox* case, so far as applicable to this case, is well set forth in a note on said case as it is reported in 31 A. L. R. 424, which note says: "A majority of the cases and the modern trend of the decisions seem to be in accordance with the rule in the reported case, that a woman, who, in good faith,

lives with a man under the mistaken belief caused by his fraud, that they are lawfully married, may recover as upon implied contract the value of the services rendered him.'' It is interesting to note that in a note in 29 L. R. A. (N. S.) 788 it is said: ''A majority of the cases hold that a woman deceived into the belief that she is married cannot sustain an action for services rendered by her as housekeeper for her supposed husband while she was living with him as his wife.'' No Illinois case on this question has been called to our attention. Assuming, but not holding, that the law in this State is as laid down in the *Fox* case, the question, tersely stated, is, do the proofs in this case tend to show that the claimant is entitled to recover under such rule of law? Under the holding in the *Fox* case one of the elements necessary to such recovery under such rule of law is fraud.

The fact that decedent told Turkalay that he had married claimant at Pinckneyville, and told five other witnesses that he had married her, and told the witness Pytlak that she was his wife, do not tend to prove any fraud upon her for the reason that the record does not show these misrepresentations were made to her or at a time when she was present, or that such misrepresentations were ever brought to her knowledge. The only other facts presented that might be claimed to be material on the question of fraud are that decedent told the witness Turkalay that claimant and he were going to be married and he was going to move her to his home the next day; that the next day or a few days thereafter he did move her to his home; that thereafter until his death she lived in his home and acted as a member of his household, occupied the same bed with him, ate at the same table with him and the rest of the family, and apparently, from all outward appearances, was his lawful wife; that the two daughters of the decedent did not know until the decedent's death that the

decedent and the claimant were not married; the fact that claimant testified that the time when she first found out or knew that they had not been married was when the will was opened; and the fact that he introduced her as his wife to the witness Brown.

This conduct of the decedent was a deception upon the public. Claimant by her conduct, both active and passive, joined in such deception, but in our opinion this evidence does not make a prima facie case of her being deceived by any fraud of the decedent. She was an adult; there is no proof she was illiterate or in any way subnormal; she had been previously married, we assume, and therefore it is fair to infer she knew something of the requirements or formalities of a marriage ceremony; there is no proof of the existence of any license, real or pretended, and no proof of any marriage ceremony whatever, real or pretended, which might lead her to believe they were married. Obviously, at least as far as this record shows, whether they were or were not or ever had been married to each other, was a matter as much within her knowledge as his.

It is only in cases where the parties do not have equal knowledge or means of knowledge of the facts represented that equity will afford relief on the ground of fraud and misrepresentation. (*Bundesen v. Lewis,* 368 Ill. 623; *Morel v. Masalski,* 333 Ill. 41.) We hold that the evidence, taken with all reasonable inferences in its aspect most favorable to the claimant, does not sustain a cause of action under the foregoing theory.

There is no evidence tending to prove, and it is not claimed, there was any express contract that decedent would pay claimant for the services rendered.

The next question that presents itself is, can claimant recover on an implied contract? From what has already been said, it follows that claimant must have known and actually knew she was living in illicit relations with the decedent. There can be no other reasonable conclusion.

In *Stewart v. Waterman*, 97 Vt. 408, 123 Atl. 524, 526, the court said, ''It is a well-settled rule that a woman who knowingly and voluntarily lives in illicit relations with a man cannot recover on an implied contract for services rendered him during such relationship. Not only does the relationship as of husband and wife negative that of master and servant, but, such cohabitation being in violation of principles of morality and chastity, and so against public policy, the law will not imply a promise to pay for services rendered under such circumstances.'' (*Lytle v. Newell*, 24 Ky. L. Rep. 188, 68 S. W. 118; *Willis v. Willis*, 48 Wyo. 403, 49 Pac. 670.) The quotation from the Vermont case states a self-evident and wholesome rule of law.

The record does not show that claimant is entitled to recover on any theory. Therefore there is no occasion for us to discuss the question of whether or not the trial court erred in the giving or refusing of instructions.

Complaint is made that the court erred in denying the claimant's motion to make the defendant pay expenses for failure to admit facts, as requested in their notice served on the defendant under Rule 18 of the Supreme Court. An examination of the notice and the request for admission of facts shows that the defendant could not have fairly admitted such facts without qualification or explanation and that the defendant's refusal to admit such facts was not based upon caprice or unreasonable grounds. A substantial portion of the facts sought to be admitted were of controvertible character and not within the purpose of the rule, and the court did not err in its ruling. (*Wintersteen v. National Cooperage & Woodenware Co.*, 361 Ill. 95.)

The judgment of the circuit court is affirmed.

*Affirmed.*